Western Newspaper Union, Inc., Appellant, *v.* Shaltz et al.

Argued October 8, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

302

*David H. H. Felix*, with him *Felix & Felix*, for appellant.

*Leonard Michael Propper*, with him *James L. Price*, *Nathaniel Budin* and *Price & Propper*, for appellees.

OPINION BY ARNOLD, J., March 15, 1949:

This action of assumpsit was tried without a jury, resulting in a judgment for the plaintiff only for an amount admitted to be due; and in favor of the defendants for the balance of the plaintiff's claim, $466.09.

Plaintiff declared on quantum meruit, averring that the items sued for were charged at reasonable and market prices, and that these the defendants agreed to pay. The affidavit of defense pleaded an express contract under which the plaintiff agreed to furnish the only service in dispute for "approximately $5.00 per week." The court found that there was such an express contract, and on this appeal by the plaintiff the principal question is whether the evidence sustains such finding, giving the defendants the benefit of all reasonable inferences and deductions therefrom.

The defendants were a publicity agency, and Philadelphia radio stations came to them with a proposition of supplying newspapers in the Philadelphia area (other than the city of Philadelphia) with daily radio schedules. Defendants got in touch with Trott, the representative of the plaintiff, and explained to him the contemplated arrangement. All matters concerning the making of the alleged contract occurred solely between Shaltz, one of the defendants, and Trott. The work which the defendants wanted the plaintiff to perform required the plaintiff to make "mats" of the radio schedules. Each station would furnish its daily pro-

grams, divided into fifteen minute intervals. The plaintiff was to set these up in type resulting in a plate containing a column for each station, and showing all programs of each station for one day. From this plaintiff was to make a mat of thin, hard paper, i. e., an intaglio of the plate. These daily mats were to be distributed to each newspaper, where a plate for printing was made by pouring molten metal on the mat or matrix. Trott and Shaltz both recognized that the program furnished by a station might be changed. If so changed, it would be necessary to change the plate which had been previously cast. Trott informed Shaltz that the making of any such corrections would be sublet to someone else. After thorough discussion, Trott mailed to defendants a written estimate which showed the various items, including the cost for corrections, which read: "Corrections thereafter approx[imately] [$]5.00 *per week*." (Italics supplied.) Trott then came to Shaltz and orally made the same proposal, repeating the various items in it, and stated that this item for corrections would take care of changes up to 20% of the items in the radio programs. Trott knew,—but defendants did not,—how corrections would be made on the plate; the work involved therein, and the charges of the compositor selected by the plaintiff.

The plaintiff sought to recover for the making of corrections in the schedule at the rate that plaintiff's compositor charged it, which greatly exceeded the "approximately $5.00 per week." But the defendants had dealings only with the plaintiff and none with the compositor. Apparently the plaintiff carefully prepared the written estimate and the oral statements so that the defendants were not given any unit price per correction and were not informed as to the cost of making corrections. All the defendants knew was that the corrections would be made by a compositor selected by the plaintiff. Neither in the written estimate nor in the oral statements

of Trott was anything said that the cost of the corrections would be whatever the compositor billed the plaintiff, i. e., it was not stated that the compositor's bill for making corrections would be passed on to the defendants.

The defendants received the oral proposal of Trott and the written estimate, and in reliance thereon they negotiated with radio stations. The latter being willing to proceed, the defendants then called Trott at the plaintiff's plant and said: "Okeh. Let's go." Plaintiff then started its work. A copy of the written estimate was then in the plaintiff's possession. Neither Trott nor any representative of the plaintiff told Shaltz that the offer and estimate, made both orally and in writing, were withdrawn, or that the work would not be done on that basis. Whether the written instrument be considered an offer, or negotiations leading up to an offer, is wholly unimportant; for under Shaltz's evidence he and Trott orally agreed on all the items of the estimate. The parties did not contemplate thereafter reducing the contract to writing. If, as the plaintiff now asserts, the oral and written estimate were not an offer, the plaintiff could withdraw at any time, and could not be bound by any "snap" acceptance by the defendants. But when the plaintiff did not repudiate or withdraw its offer upon the defendants' acceptance, a valid contract was made, based on the oral proposals. Therefore the court's finding that it was an express contract is sustained.

The item of the express contract to make corrections for "approximately $5.00 a week" (if corrections did not run over 20% of the items) is not bad because of indefiniteness. The law does not require certainty but only reasonable certainty: Restatement, Contracts, § 32. In *Van Sciver v. Van Sciver*, 337 Pa. 390, 12 A. 2d 108, a man contracted with his wife, inter alia, to place securities in trust so as to yield to her an annual income "of approximately three thousand dollars per

year. . . ." The securities deposited originally yielded the income, but thereafter the income therefrom greatly diminished. The Supreme Court held that "Approximately means 'reasonably near to'"; that her income was not fixed definitely at $3,000 but at approximately that sum; and that when the income did reasonably approximate $3,000, acceptance by her amounted to acquiescence, "but in the succeeding . . . [years], where there was a deficiency of much larger sums, the wife should be awarded the deficiency." See also *Nickel v. Zeitz et al.* (Mass.) 154 N. E. 769.

When the defendants received the first bills from the plaintiff the correction charges ran as high as $30 or $40 *per day*. Defendants immediately sent for Trott, who told them that "he had erred in the estimate" for this item.[1] Trott then stated that instead of making a plate and mat for all of the stations for each day, a separate plate and mat for each station be made for Friday, Saturday and Sunday (days when most of the corrections appeared), and if this were done he was pretty sure the cost would come down to his original estimate; and that to do this would require mats and plates which would cost about $40 or $50 apiece. Relying on this, defendants acceded, for they were committed to the radio stations. Defendants ordered and paid for the additional plates and mats. When the next bills came in, while the correction charges were less, they were still greatly in excess of the contract price of $5.00 per week. Trott next suggested that separate mats for each station be made for each day in the week, and that if this were done he was sure that the price would come down to the contract price. Again the defendants, relying on this, paid the additional amounts required. The prices did come down but only to $20 or $25 per day, instead of the figure of approximately $5.00 per week.

---

[1] Trott did not deny making this statement.

The defendants repeatedly protested these composition and correction charges, but paid these bills to the plaintiff. Keeping in mind that defendants made a contract with the radio stations on the faith of their contract with the plaintiff, the defendants did not act unreasonably. The general manager of the plaintiff testified that he told Trott to tell the defendants that the item for corrections was cost plus ten per cent., but the defendant, Shaltz, testified that Trott did not so tell him. The general manager for the plaintiff testified that he "assumed" that the charge of approximately $5.00 a week was for "a few changes,"[2] but at the same time the plaintiff had in its office a copy of the written estimate given by it. The general manager did not call on the defendants and notify them that the plaintiff would not do the work except on the cost plus basis, and it never repudiated the express contract. If Trott made a mistake whereby the plaintiff entered into an improvident contract, the plaintiff cannot be relieved therefrom. Likewise if Trott did not convey to the defendants the information that the general manager directed, the plaintiff cannot be relieved. Since the bills rendered in March were paid upon the assurance that the making of certain changes would bring the cost down to the contract price, the defendants are not estopped by the payment of these bills. They never expressly or impliedly agreed to any modification of the express contract. In fact, the defendants were not advised by anyone at any time that the work was being done on a cost plus basis. Not only did defendants continuously object to the additional charges and at no time waive their rights, but plaintiff never denied the

---

[2] Thus the actual controversy in this case does not concern the presence or absence of a contract, but whether the parties agreed that "approximately $5.00 per week," was "for a few changes." The defendants testified, and the court found, that the parties agreed it was for changes up to 20%.

existence of the contract, or that it was bound by the stipulation in question. Also the plaintiff performed all the rest of the contract at the prices quoted and agreed upon. Therefore the defendants could still maintain their present position, i. e., that the plaintiff was doing this work on an express contract.

The appellant also argues that Trott had no authority to make a contract such as this. In the light of the facts recited herein there can certainly be nothing in this position and, if needed, there was clearly a ratification of his authority.

Judgment affirmed.